## M. M. BRANTLEY v. STATE.

No. A-2460.   Opinion Filed April 2, 1918.

Rehearing Denied September 24, 1918.

(175 Pac. 51.)

1. **HOMICIDE—Information—Sufficiency—Murder.** An information for murder, which, after alleging time and venue, charges that the defendant "did then and there, willfully, unlawfully, intentionally, feloniously, without authority of law, and with a premeditated design to effect the death of the said J. J. F., shoot and discharge leaden shot and bullets into the body of him, the said J. J. F., from a certain loaded shotgun which he, the said defendant, then and there had and held in his hands, then and there and thereby inflicting upon the body of him, the said J. J. F., a mortal wound, of which he, the said J. J. F., then and there did die," sufficiently charges the crime of murder, and a demurrer thereto was properly overruled.

2. **SAME—Trial—Instruction.** On a trial for murder, where the issue was justifiable homicide in necessary self-defense, see opinion for approved instructions.

3. **TRIAL—Verdict—Affidavits of Jurors.** Affidavits or oral testimony of jurors are inadmissible to impeach their verdict, and affidavits of the defendant, or any other person, of alleged misconduct of a juror, upon information derived from particular jurors, are inadmissible to impeach the verdict.

*Appeal from District Court, Jackson County;*
*Frank Mathews, Judge.*

M. M. Brantley was convicted of manslaughter in the first degree, and he appeals.   Affirmed.

. M. M. Brantley was tried in the court below upon an information alleging that in said county on or about the 30th day of November, 1914, he did kill and murder one J. J. Ferguson by shooting him with a shotgun.   The jury by their verdict found him guilty of manslaughter in the first degree, and assessed his punishment at imprison-

ment in the penitentiary for the term of 28 years. From the judgment rendered in pursuance of the verdict, the defendant appeals. The evidence, briefly stated, is as follows:

W. M. Ferguson, father of the deceased, testified:

I am seventy-two years old, and in 1914 lived on the place of the defendant, M. M. Brantley. My son J. J. or Jim Ferguson also lived on his land. We had rented from Brantley about two hundred acres and this included the alfalfa land which lay west of my son Jim's house. I was present when Jim Ferguson was killed by the defendant. It was on Mr. Jones' place, just north of where Jim lived. I, my wife, the two Jones boys, and Mrs. Cid Randall were all present at the killing. We were picking cotton in the Jones cotton field, and my son was picking cotton at the time; his rows ran east and west and he was picking west. I was near by, and I was picking east. I first saw the defendant approaching when he was about two hundred yards away and a little southwest of us. Jim was down on his knees picking cotton. My wife and Mrs. Randall were some ten or fifteen yards south of me, talking, and I was on my knees picking cotton at the time. When defendant got nearly to Jim I turned around and looked straight at him, and saw that he had a shotgun on his shoulder. He stopped about four rows from Jim, and I looked at him until he shot Jim. At that time Jim was still on his knees picking cotton. He fired two shots close together. Jim pitched over on his face when he was shot. I ran to him and sort of straightened him out, and in doing so I raised him up and pulled his sack and put my own sack under him. In picking cotton he kept his sack on the right side. When he was killed his sack had some ten or fifteen pounds of cotton in it. (Here the sack is offered and identified by witness.) Jim was about thirty-two years old at the time of his death. I didn't hear any conversation between my son and the defendant. I only heard my son say "I did not do that." There were three or four rows of cotton be-

tween he and Brantley, and the shots occurred as quick as a man could shoot a double-barreled gun.

Dr. Abernathy testified that he examined the body of Ferguson, and found that he was shot through the chest from the front, the wound being about the middle of the breast, and ranged down at an angle of 45 degrees to the left side; that is, the shot went backward and downward; that most of the shot went in at the hole, but some eight or ten scattered in a radius of four or five inches around.

Martha Ferguson testified:

I am sixty-two years old. Jim Ferguson, who was killed, was my son. I was present in the cotton patch with my husband, Mrs. Randall and the Jones boys when Jim was killed. I saw the defendant talking with some one in the alfalfa field about a quarter of a mile away from us, and then I saw him come over in the Jones field, where we were all picking cotton. He came quartering across the field to Jim. The defendant walked up to Jim and says, "How's all?" Jim says, "All right." The defendant said, "Them hogs is ruining this cotton patch up here." Jim says, "I have been feeding a herd with my hogs, but I don't know whose they are." Jim was picking cotton towards the west on two rows and was on his knees. Mrs. Randall started off and I heard a gun fire. I turned and looked, and saw the gun pointing towards Jim. He was shot while he was on his knees. The defendant was about three or four rows west of him. I started running to him, and I said, "Brantley, what did you do that for?" and he said, "Because he was a damn thief and always will be." I raised Jim's head up, but he never spoke. He had fallen on his sack; he had it on. The defendant threw the shells out of his gun and rammed in another shell, and he held his gun so that I thought I would get it next. Jim's sack had eight or ten pounds of cotton in it. We were picking in the Jones field that day to get grub enough to pick on the following week. Jim's cotton was planted late and the hail got it.

Coy Jones testified:

I am fifteen years old; in the sixth grade at school. Knew the defendant and knew Jim Ferguson. He lived half a mile west of us, on Mr. Brantley's' farm, and Brantley also had land south of us. Jim was picking cotton in the Jones cotton field, and his father and mother and my brother were there. There were forty acres in the field. Mrs. Randall was there that evening. I was up in the wagon and saw Mr. Brantley coming. He got up to two or three feet of Jim and stopped. Grandpa Ferguson and Mrs. Ferguson and Mrs. Randall were south. The women were not picking at the time, but were talking. The wagon I was in was about one hundred yards southeast of where Jim was. He was on his knees picking cotton when Brantley came up. I saw the shooting. They were about ten feet apart. Brantley fired two shots right together. Jim was kind of on his foot and knee.

Mrs. Cid Randall testified:

I was in the Jones cotton patch. Went to carry home some coffee I had borrowed. Found Grandpa, Grandma, and Jim Ferguson in the field; also Coy and Rufus Jones were there. Mr. Brantley stopped and talked with Jim Ferguson. I only heard Mr. Brantley say something about hogs. Jim was on his knees a part of the time. He got up and then down again. He was picking cotton when I saw him last. Before the shots he was on his knees. I looked and saw Jim falling to the east. Mrs. Ferguson said, "Mr. Brantley, what did you do that for?" He said, "Because he was a thief and a robber." Grandpa was the first to him, Grandma next, and then myself. He was on his knees, his head on the ground. I noticed nothing in his hand but a little cotton in his right hand.

As a witness in his own behalf the defendant testified that his age was 60 years; that he had rented to the deceased and his father some land to be cultivated in cotton, corn, and feed crops for the crop year of 1914, for the

customary rental of one-fourth of the cotton and one-third of the corn and other feed crops, the south half of one quarter section being in alfalfa; that when the first alfalfa crop was ready to cut the deceased claimed his lease included the alfalfa land; that the agreement was that if he had his crops in condition and was able to take care of the alfalfa he might do so; that if the other crops were not in condition he was not to get the alfalfa; that at cutting time with his hands he began mowing the alfalfa, and had cut several acres, and the next morning the deceased would not allow his hands to enter on the place; that the deceased had a single-barreled shotgun, and said, "If you come on here I will kill you;" that he went to town and entered suit; as a result of the suit he finished cutting and saved that crop; that the next crop was cut by the deceased, and he got his rents; that several persons told him they had heard Jim Ferguson make threats against him, and that he had an automatic and a couple of guns at the house.

His account of the killing was as follows:

I saw some stock on my alfalfa that morning, and started over there and came up with the Randall boy, who told me that Mr. Brogden had drove the stock there. I had a number of hands picking cotton for me that day, and I went with cotton to the gin at Headrick and got back about 4 o'clock. I went to see the deceased to ask him about sowing wheat where they had cotton, as the cotton had made nothing, and also, while talking to the deceased, looking over to the alfalfa field I saw stock over there. I inquired whose stock was on the alfalfa, and he said it was none of my God damn business, that he did not want me monkeying with his business; and I turned around twice to leave, and heard a movement, and looked back and he was up seven or eight feet away coming at me with his knife. He had made two or three steps towards me, and

I shot as fast as I could. I shot because he was cursing me and coming at me with a knife. I am pretty sure that he went into his pocket and pulled out a knife and opened it. He had threatened me so much that I was on the watch for him. I thought he aimed to run under my gun, and he said, "Damn you, I will get you now." I reloaded my gun from habit. My gun was a hammerless, and I carried it ready for shooting. I did not go there with the intention of killing him. I was excited and made two efforts to get away. I saw a boy in the wagon, but could not tell who he was. Mrs. Ferguson commenced hallooing and screaming. I have studied it over since the occurrence, and think I said I killed him because he was coming at me with a knife, and that he was a damn thief and rascal or robber.

The record covers more than 800 pages, but the foregoing is a sufficient statement for the purpose of this opinion.

*S. B. Garrett* and *Dabney & Thorp,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., *R. McMillan,* Asst. Atty. Gen., and *C. E. Hall,* Co. Atty., for the State.

DOYLE, P. J. (after stating the facts as above). The plaintiff in error was tried in the district court of Jackson county upon an information which, omitting merely formal parts, charges:

"That at and within said county and state, on or about the 30th day of November, A. D. 1914, and anterior to the filing of this information, one M. M. Brantley, of Jackson county, state of Oklahoma, then and there being, did then and there willfully, unlawfully, intentionally, feloniously, without authority of law, and with a premeditated design to effect the death of one J. J. Ferguson commit the crime of murder in the manner and form as follows, to wit: The said M. M. Brantley did then and there willfully, unlawfully, intentionally, feloniously, without authority of law, and with a premeditated design to effect

the death of the said J. J. Ferguson, shoot and discharge leaden shot and bullets into the body of him, the said J. J. Ferguson, from a certain loaded shotgun, which he, the said M. M. Brantley, then and there had and held in his hands, then and there and thereby inflicting upon the body of him, the said J. J. Ferguson, a mortal wound of which he, the said J. J. Ferguson, then and there, on the said 30th day of November, A. D. 1914, did die; that the said M. M. Brantley, in manner and form as aforesaid, did then and there kill and murder the said J. J. Ferguson, contrary to," etc.

The jury by their verdict found him guilty of manslaughter in the first degree, and assessed his punishment at imprisonment in the penitentiary for the term of 28 years. February 20, 1916, a motion for new trial was overruled, and judgment was rendered in accordance with the verdict. From this judgment the defendant prosecuted an appeal by filing in this court on May 14, 1915, his petition in error with case-made.

The first assignment of error is that the court erred in overruling the demurrer to the information on the ground that it does not state facts sufficient to constitute an offense.

The information sufficiently charges the crime of murder, and is sufficient in every way. The demurrer was therefore properly overruled.

Other assignments are based on exceptions to rulings on evidence. We do not think any of these exceptions are well taken, or that they require discussion.

Other errors assigned challenge the correctness of the court's charge to the jury, in that "as a whole it does not give the substantial law applicable to the proven facts in the case," and are based on exceptions taken to certain

instructions given, and rulings of the court in refusing to give requested instructions.

The court's charge consists of 26 instructions. Believing that the instructions excepted to furnish in themselves better proof of their correctness, fairness, and com-. prehensiveness in application to the facts than could be demonstrated by any discussion of them, we will here insert them, together with the instructions given in lieu of those requested by the defendant. They are as follows:

"(7)   Homicide is not without authority of law, but is justifiable, where committed by any person in resisting an attempt to murder him or to commit a felony upon him, or when committed in the lawful defense of such person when there is a reasonable ground to apprehend a design of the person killed to do some great personal injury to the person doing the killing, and there is imminent danger of such design being accomplished.

"(8)   A person who is unlawfully attacked is not bound to retreat to avoid the necessity of injuring his assailant, or of killing him, when it reasonably appears necessary to save his own life or to avoid serious bodily injury from the person killed. The killing under such circumstances will be self-defense, and it is not necessary to the right of self-defense that the danger should in fact exist, and, if it reasonably appears from the circumstances of the case that danger exists, the person threatened with such apparent danger has the same right to defend against it and to the same extent that he would have were the danger real.

"(9)   When an attack has been made by one person upon another and the person making the attack is killed, in determining whether the killing is justifiable, the nature and purpose of the attack, the existence of or appearance of danger and extent thereof, the amount or degree of force necessary and sufficient to be used to avoid the apparent or threatened danger, and all of the facts and cir-

cumstances in the case must be viewed and considered from the standpoint of the person doing the killing, at the time of the killing, and from no other standpoint, and if, when viewed from his standpoint it reasonably appears that the killing was necessary to prevent death or great bodily harm to the person who did it the killing will be justifiable.

"(10) You are further instructed that while one unlawfully attacked has the right to use such force as under the circumstances reasonably appears to him to be necessary to repel the attack and avoid injury to himself, yet he will not be justified in using greater force than reasonably appears to him necessary and sufficient to do so; and if he does use greater force than reasonably appears to him to be necessary and sufficient to avoid the danger or apparent danger, and thereby kills the person who made the attack, he will be guilty of manslaughter in the first degree; and as applied to this case, if you find that J. J. Ferguson, at the time and place alleged in the information, made an unlawful attack upon the defendant, and should you further find beyond a reasonable doubt that in resisting such attack it was not necessary for defendant to shoot the said J. J. Ferguson, and that from the nature of such attack, and under all the facts and circumstances as shown by the evidence, it did not reasonably appear to the defendant that it was necessary to shoot the said J. J. Ferguson to prevent serious bodily injury then and there to himself, and that he then, under such condition, shot and killed the said Ferguson, the defendant will be guilty of manslaughter in the first degree, and it will be your duty to so say by your verdict, unless you should find the shooting was justifiable or have a reasonable doubt thereof, in which case you should acquit him.

"(11) While a person need not be in actual imminent peril of his life being taken, or of great personal injury being done him, yet if the jury believe that the defendant had reasonable grounds to believe and did believe, from the facts as they reasonably appeared to him at the time, that

the danger was so urgent and pressing, or apparently so urgent and pressing that the defendant could not avoid the necessity of killing in safety to himself to protect himself from death or great personal injury, then if under such circumstances the killing took place it was justifiable.

"(12) In this connection you are told that self-defense, under the law, is a defensive and not an offensive act, and for a person to avail himself of a plea of self-defense, in order to justify a killing, it must reasonably appear to him at the time he fired the fatal shot that the act upon the part of the deceased by which the defendant seeks to justify the killing was such an act as made it reasonably appear to him at the time that he was in danger either of losing his life or of great personal injury being done him, and it is the duty of a person so threatened with danger to his life or of great personal injury being done him to use at the time all reasonable means apparent to a reasonable person under the circumstances to avoid such danger before taking human life, except that he is not bound to retreat to avoid such necessity or apparent necessity of killing, provided he has done no act upon his part to bring about the attack, or threatened attack, if any, by the deceased.

"(13) In determining the question as to whether or not the defendant was in danger or apparent danger, under these instructions you are told that the law requires you to view the circumstances at the time from the defendant's standpoint as they reasonably appeared to him.

"(14) Evidence has been introduced herein relative to a difficulty or difficulties between the deceased and defendant which have occurred previous to the fatal difficulty. This evidence should be considered by you, with the other evidence in the case, for the purpose of assisting you in ascertaining the state of mind of the respective parties at the time of the homicide, and for the purpose of assisting you in determining whether or not the defendant, in good faith, believed that he was in danger of losing his life or of receiving serious bodily injury at the hands of the de-

ceased at the time of the subsequent difficulty in which deceased was killed.

"(15) You are instructed that insulting words or insulting conduct or epithets or assaults previously made—that is, anterior to the actual time of the killing—had and done to the defendant at other and different places than at the scene of the homicide, nor insulting epithets, no matter how opprobrious, at the time of the killing, do not justify or mitigate a homicide.

"(15B) You are instructed that what is or is not an overt action—that is, what acts upon the part of the person slain will justify the person taking his life—varies with the circumstances of each particular case. Under some circumstances the slightest movement may justify instant action on the part of the person threatened with danger, upon the ground of reasonable apprehension of danger. Under other circumstances this might not be true, and it is for the jury, viewing the facts and circumstances in evidence from the defendant's standpoint, to determine how this may be in each case.

"(16) Evidence has been introduced herein upon the part of the defendant tending to prove that prior to the fatal difficulty the deceased had made threats of violence against defendant, and such threats, should you find the same to have been made, should be considered by you, in connection with all the other evidence in the case, to assist you in determining the deceased's feeling toward the defendant and to assist you to determine who was the probable aggressor in the fatal difficulty; also, if you find from the evidence that prior to the fatal difficulty, the defendant had been informed that the deceased had made threats of violence against him, and in good faith believed the information (whether such information was in fact true or not being immaterial), then you should consider that fact, should you so find, together with all the other facts and circumstances in evidence before you in this case, to enable you to determine the state of the defendant's mind, and what he might have reasonably apprehended from the

overt acts and demonstrations of the deceased, if you find he made any, on the occasion of the fatal difficulty; and if you have a reasonable doubt as to whether the deceased, at the time of the fatal difficulty, was making an attack upon the defendant in such a manner as, viewed from the defendant's standpoint, that it reasonably appeared to him that the deceased was about to take his life or inflict serious bodily injury upon him, then in that event you shall consider any threats you find the deceased made against the defendant, and give the same such weight and value as you deem the same entitled to; but mere threats alone, though actually made and communicated and however violent they may be, will not justify, excuse, or mitigate a homicide. The law does not permit one person to kill another merely because the other has made threats against him or previously assaulted him, unless the deceased, at the time of the fatal difficulty, without being wilfully provoked thereto by the defendant, and without the defendant having brought on the difficulty, made some overt act or demonstration, indicating to the defendant, as a reasonable man, an intention to kill him or to do him some great bodily harm; and should you find in this case beyond a reasonable doubt that at the time of the fatal difficulty, that the deceased did not make some overt act or demonstration indicating to the defendant, as a reasonable man, an intention to assault him and do him some serious bodily harm or kill him, then any threats previously made against the defendant, and the fact that there had been a previous difficulty, are immaterial for any purpose in the case, and should not be considered by the jury, but entirely disregarded, and given no weight whatever under such circumstances.

"(17) You are instructed that the knowledge of the defendant derived from personal observation as well as otherwise of the violent temper of the deceased, if you find such to be the case, and of his violent and turbulent character, if such you find to be the case, and his liability to attack persons when angered or aroused, if such you find to be the case, and also the knowledge of the defendant

that the deceased was in the habit of carrying a pistol or other deadly weapons, and his disposition to use the same when aroused or angered, if such you find to be the case, should be considered by you and given just such weight as you deem the same entitled to have in determining, from the standpoint of the accused, the reasonableness of the danger apprehended by him and from which the defendant might estimate the conduct of the deceased, the character of the attack or threatened attack, if you find the deceased made any attack or threatened attack, or apparent attack, and what he might have expected from the deceased as well as that which he might have at the time deemed necessary to guard himself against.

"(18)    The jury are instructed that if you find from the evidence that the deceased made threats against the defendant which, if carried into execution, would endanger his life or subject him to great bodily harm, and that the defendant feared or had reason to fear that such threats were liable to be carried into execution, then you are instructed that the defendant could not lawfully assault the deceased on account of such threats or because of fear induced thereby, unless the deceased at the time of the fatal difficulty made some demonstration or performed some overt act that caused reasonable apprehension that such threats were about to be put into execution, and, in case of such demonstration or overt act, the defendant may lawfully become the aggressor only to the extent of putting himself in a position of safety as against the unlawful threatened acts of the deceased. If, under the circumstances and facts of this case, you find beyond a reasonable doubt that the defendant intentionally carried his acts of aggression, if any there be, further than were reasonably necessary to place himself in a situation of apparent safety, his acts then would be such as to render his acts of aggression unlawful, and you should, under such circumstances, consider the evidence as a whole, together with such acts of aggression, if any such act you find, in determining his guilt or innocence under the charge made in the information.

"(19) In order to constitute murder under our statute, it is essential that the homicide be committed with a premeditated design on the part of the defendant to unlawfully take the life of the person slain; and in order that you may fully understand the legal meaning of the words 'Premeditated design,' as used in this connection, I charge you that should the unlawful killing be established to your satisfaction beyond a reasonable doubt, then to determine the grade of the homicide it becomes necessary for you to inquire into the condition of the mind of the party killing, and in reaching this conclusion the important questions to be considered are: Do the facts and circumstances in the case at the time of the killing, and before and immediately after that time, having connection with or relation to it, furnish satisfactory evidence, beyond a reasonable doubt, of a deliberate mind on the part of the person killing to do the killing at the time he does the act that results in the killing? And do these facts and circumstances show beyond a reasonable doubt a formed design on the part of the person killing to take the life of the person slain? If they do, then the killing will be by premeditated design and will be murder. Premeditated design includes malice aforethought, and accordingly, to warrant a conviction for murder, the jury must be satisfied from the evidence beyond a reasonable doubt that the killing was a consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately and with a deliberate mind; that is, at the time when the mind of the person killing was self-possessed and capable of contemplating the consequences of the act proposed to be done.

"There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing. A single moment of time may be sufficient, all that is required being that the mind be cool and deliberate in forming its purpose, and that the design to kill is formed, and the design to effect death is inferred from the fact of the killing, unless the circumstances raise a reasonable doubt as to whether or not any such design

existed. When the evidence satisfies your mind beyond a reasonable doubt that the killing was the result of a previously formed design, and that the design was formed when the mind was calm and deliberate and capable of contemplating the consequences of the act proposed to be done by him, and such killing is further shown to have been unlawful and done with malice and premeditated design, then the homicide is murder, and, should you find beyond a reasonable doubt, your verdict should be rendered accordingly.

"To warrant a conviction for murder, the jury must be satisfied by the evidence beyond a reasonable doubt that the defendant, before the act, deliberately formed the design with a cool and deliberate mind to kill the deceased, and that the defendant proceeded in accordance with that design to the infliction of the death wound. The act, to constitute murder, must not result from a mere sudden, rash, inconsiderate impulse, passion, or excitement, however unjustifiable and unwarranted it may be.

"Now, if you believe from the evidence beyond a reasonable doubt that the defendant, in Jackson county, Oklahoma, on or about the 30th day of November, 1914, and anterior to the filing of this information, to wit, the 6th day of January, 1915, did then and there at said time and place alleged willfully, unlawfully, intentionally, and feloniously, without authority of law and with a premeditated design to effect the death of J. J. Ferguson, shoot the said J. J. Ferguson as alleged in the information with a certain shotgun, then and there had and held in his hand, and did thereby inflict a mortal wound upon the said J. J. Ferguson, of which he did then and there die, then it will be your duty to find the defendant guilty of murder as charged in the information, unless you should find that at said time said defendant was justifiable, or have a reasonable doubt thereof, in which case you should acquit the defendant of the charge of murder.

"(20) If you have a reasonable doubt that the defendant is guilty of the crime of murder as herein sub-

mitted to you, then you may next inquire as to whether or not he is guilty of the crime of manslaughter in the first degree. If you believe from the evidence beyond a reasonable doubt that the defendant, in the county of Jackson, state of Oklahoma, on or about the 30th day of November, 1914, and anterior to the filing of this information on the 6th day of January, 1915, did unlawfully shoot and kill the deceased; but that such act of killing was perpetrated without a design to effect the death of the deceased, but in a heat of passion and in a cruel and unusual manner, or by means of a dangerous weapon, then you will find the defendant guilty of manslaughter in the first degree, and so say by your verdict, unless you should find, or have a reasonable doubt thereof, that said killing was committed under such circumstances as constitute justifiable homicide, in which case you should acquit the defendant.

"(21) If you believe, or have a reasonable doubt thereof, that at the time of the fatal difficulty that the deceased, without any act upon the part of the defendant showing a purpose to do bodily harm to the deceased, did then and there by some act upon his part then done, make it reasonably to appear to the defendant, viewed from the standpoint of the defendant, that it was then and there the purpose of the deceased to assault him or to do him some personal injury, then in that event the defendant had a right to shoot the deceased in his self-defense, if it was then and there necessary, or apparently necessary, for him to do so in his own proper self-defense; and, if he did so shoot the deceased under these circumstances, then you are instructed that you should find him not guilty, and, unless you find beyond a reasonable doubt that the defendant unlawfully killed the deceased, you must return a verdict of not guilty.

"(22) If you find the defendant guilty of murder or of manslaughter in the first degree, you will state in your verdict of which offense you so find him guilty, and you may, if you see fit, assess his punishment therefor, as such punishment is stated in paragraph number 22A of these

instructions. If you find a verdict of guilty of either of said offenses, and fail to agree on the punishment therefor, then simply say by your verdict that you find the defendant guilty, naming the offense, and that you leave the punishment to be fixed by the court, except if you find him guilty of murder, then the jury must fix the punishment.

"(22A)   The punishment fixed by law for the offense of murder is death, or imprisonment in the state prison for life, in the discretion of the jury. The punishment for manslaughter in the first degree is imprisonment in the state prison for any term not less than four years.

"(22B)   If from the evidence you are satisfied beyond a reasonable doubt that the defendant is guilty of murder or of manslaughter in the first degree, but have a reasonable doubt as to which of said offenses he is guilty, then you must give him the benefit of the doubt, and not find him guilty of a higher offense than manslaughter in the first degree.

"(22C)   The jury are the sole judges of the facts proven in this case, and of the credibility of the witnesses who have testified herein, and the weight and value to be given to their testimony. In determining the credit you will give to any witness, and the weight and value you will attach to his evidence, you should take into consideration the conduct and demeanor of the witness on the stand, and his manner of testifying, his means of knowing the facts about which he testifies, the reasonableness or unreasonableness of his statements, and his interest, if any, in the result of the trial; all these matters being taken into account by you, together with all the other facts and circumstances before you, it is your province to give to each witness such credit, and the testimony of each witness such weight and value, as you deem it entitled to have. In determining the facts proven in the case, you should bring to your assistance in considering the evidence your common sense and your knowledge of human nature and your experience in human affairs.

"(23)  The defendant in a criminal case is not required by law to prove his innocence, but the burden is upon the state to prove his guilt of the offense charged against him and every material element thereof beyond a reasonable doubt.  He is presumed to be innocent of such charge until his guilt is established by legal evidence beyond a reasonable doubt, and, in case the jury have a reasonable doubt as to the defendant's guilt, they must acquit the defendant and return a verdict of not guilty.

"(24)  By the term 'reasonable doubt,' however, is not meant a mere misgiving of the imagination, a fanciful conjecture, or a suggestion of sympathy for the defendant; but a reasonable doubt is an actual doubt, arising from the evidence or want of evidence in the case.  The state is not required to prove the defendant's guilt to an absolute or mathematical certainty or beyond any possible or imaginary doubt.  If, however, after considering, comparing, and weighing all the evidence in this case, your minds are left in that condition that you cannot say that you feel an abiding conviction to a moral certainty of the defendant's guilt, then you would have a reasonable doubt and it would be your duty to acquit the defendant.  On the other hand, if the evidence in the case establishes in your minds the guilt of the defendant to a reasonable and moral certainty, such a certainty as convinces and directs the understanding and satisfies the reason and judgment of you, who are bound to act conscientiously upon it, then you would have no reasonable doubt, and it would be your duty to convict the defendant.

"(25)  The jury are instructed that, in arriving at a verdict in this case, that they are governed by the evidence that is permitted to go to the jury, and that you are to entirely disregard any question that may be asked by counsel to which the court has sustained an objection, and that the jury are to entirely disregard and put from their minds any statement of counsel, if any such there be, if such statements are not based upon the evidence in the case, or which are not a reasonable and fair deduction from

the evidence in the case and the law as given you by the court.

"(26) The jury are further instructed that it will require the concurrence of the full panel of the jury to render a verdict in this case, and that you must not arrive at your verdict by casting lot or by any manner or species of chance. You must be controlled in arriving at your verdict by the law as stated in these instructions and by the evidence you have heard from the witnesses. You must consider these instructions in their entirety; you have no right to consider any part or portion of these instructions to the exclusion of any other portion thereof."

Thus it appears that the defense interposed by the defendant and the law applicable thereto were fully and fairly submitted to the jury in a charge commendably clear and adequate. The tenth instruction is not the same as the instruction condemned by this court in the case of *Franks v. State,* 8 Okla. Cr. 71, 126 Pac. 582. The vice of the instruction in the Franks case lay in the use of the words, "Just such force as was necessary," and *"no more."*

We again approve instruction No. (9), given in the case of *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988, which instruction was inadvertently condemned in the case of *Humphrey v. State,* 8 Okla. Cr. 449, 128 Pac. 742, and cited in the defendant's brief. While the general rule often stated by this court is that trial courts should not give definitions of "reasonable doubt," except upon the request of defendant, we are of the opinion that the instruction here given did not constitute material error.

In another assignment the defendant complains that the court, despite the objections of the defendant's counsel, permitted the county attorney to go beyond the limits of legitimate argument in making statements that were prejudicial to the rights of the defendant, and in permit-

ting the county attorney in his closing argument to the
jury to put on the cotton sack alleged to have been worn
by the deceased at the time of the fatal difficulty to
demonstrate before the jury therewith, when there was no
dispute that the defendant had fired the fatal shots. We
do not think the objections merit discussion. The county
attorney certainly had the right in his argument to discuss
all the facts bearing on the issue within the scope of the
evidence. See *Saunders v. State*, 4 Okla. Cr. 264, 111 Pac.
965, Ann. Cas. 1912B, 766; Wigmore on Evidence, sec.
1157.

Several assignments are based upon alleged miscon-
duct of a juror and alleged newly discovered evidence as
set out in the defendant's affidavit in support of an amend-
ment to his motion for new trial, to the effect that while
the jury were deliberating of their verdict "one of said
jurors, namely, W. M. Varnell, as defendant is informed
and believes and so charges and alleges," stated to the jury
"that this defendant had prior to the charge of homicide
in this case been guilty of killing two men," which affi-
davit concludes as follows:

"The defendant further says that he has not been able
to procure voluntary affidavits from jurors who sat in
said case in support of the foregoing allegations, but that
said jurymen will testify on the witness stand that the
foregoing facts were disclosed to them in manner as afore-
said, and the defendant asks the court to hear the evidence
of said jurymen, or a sufficient number of them to establish
the truth of this amended motion and of the allegations
therein contained."

The county attorney filed a motion to strike the said
amendment on the ground, among others, that affidavits or
oral testimony of jurors are inadmissible to impeach their
verdict. Thereupon the defendant offered to introduce

R. G. Lee, J. L. Platt, and J. O. Hughes, jurors who sat upon the trial of the case, to show by their testimony that the evidence set out in said amendment to the motion for new trial was received in the jury room during the deliberations of the jury. The court sustained the motion to strike the amendment and allowed an exception.

In numerous decisions of this court the uniform holding is that affidavits or oral testimony of jurors are inadmissible to impeach their verdict. In the recent case of *Craddock v. State,* 13 Okla. Cr. 724, 167 Pac. 331, the decisions are collated. Judge Matson, delivering the opinion of the court, said:

"It has been clearly established in this state that a juror will not be permitted to impeach his verdict, after he has been discharged and mingled with the public, either by affidavit or oral testimony."

In the case of *McDonald v. Pleas,* 238 U. S. 264, 35 Sup. Ct. 783, 59 L. Ed. 1300, Mr. Justice Lamar, delivering the opinion of the court, used the following language:

"For while by statute in a few jurisdictions, and by decisions in others, the affidavit of a juror may be received to prove the misconduct of himself and his fellows, the weight of authority is that a juror cannot impeach his own verdict. The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

"These two conflicting considerations are illustrated in the present case. If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method

of arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established. that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication, and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation the constant subject of public investigation, to the destruction of all frankness and freedom of discussion and conference. * * *

"There are only three instances in which the subject has been before this court. In *United States v. Reid*, 12 How. 366, 13 L. Ed. 1023, .1025, the question, though raised, was not decided because not necessary for the determination of the case. In *Mattox v. United States*, 146 U. S. 140, 148, 36 L. Ed. 917, 920, 13 Sup. Ct. 50, such evidence was received to show that newspaper comments on a pending capital case had been read by the jurors. Both of those decisions recognized that it would not be safe to lay down any inflexible rule, because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases; and without attempting to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion, it is safe to say that there is nothing in the nature of the present case warranting a departure from what is unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict. The principle was recognized and applied in *Hyde v. United States*, 225 U. S. 347, 56 L. Ed. 1114, 32

Sup. Ct. 793, Ann. Cas. 1914A, 614, which, notwithstanding an alleged difference in the facts, is applicable here."

In the case of *People v. Hartung,* 4 Parker, Cr. R. (N. Y.) 314, it is said:

"But if jurors should not be allowed to give evidence to destroy their own verdict, how much more objectionable it would be to allow them to expose the occurrences of the jury room, and to allow their unsworn and irresponsible statements to be brought secondhand before the court in support of an application to set aside their verdict. It is impossible to give the least effect to such statements without a fearful departure from the very first principles of evidence."

And see *Commonwealth v. Meserve,* 156 Mass. 62, 30 N. E. 166, and *State v. Freeman,* 5 Conn. 349.

Mr. Thompson says:

"If the courts refuse, on ground of public policy, to listen to primary evidence of the facts, they will, of course, for stronger reasons, refuse to listen to secondary evidence of it. What the law will not allow to be proved by the oath of the person having knowledge, it obviously will not allow to be proved by the oath of another person deriving his information from the unsworn statement of the former person. It follows that the affidavits of counsel, or other persons, of the misconduct of the jury, upon information derived from particular jurors, will not be heard to impeach the verdict." (Thompson on Trials, sec. 2622.)

It follows that the court rightly ruled in sustaining the motion to strike the amendment.

Aside from the testimony of the defendant, the evidence is undisputed that the killing was premeditated and deliberate. Viewing the defendant's testimony from the standpoint most favorable to him, it shows that he went to the field where the deceased was picking cotton, armed

with a double-barreled shotgun, both barrels loaded with No. 4 shot; and if it be assumed that the deceased was awaiting an opportunity for a difficulty with the defendant, and drew a knife, the latter's conduct provoked it, and showed that he was willing to engage in mutual combat; that he was armed for the purpose, and did what was necessary to precipitate it; so upon the defendant's testimony it was a mutual combat, which made the shooting of deceased either murder or manslaughter, and we think the evidence in the case was amply sufficient to support a verdict for murder.

After a very careful examination of the record, we have failed to discover any prejudicial error. The judgment of the district court of Jackson county is therefore affirmed.

ARMSTRONG and MATSON, JJ., concur.