## WESLEY BUCK v. STATE.

No. A-2787—Opinion Filed May 3, 1919.

Rehearing Denied Sept. 6, 1919.

(182 Pac. 913.)

1. **HOMICIDE—Manslaughter in First Degree—Evidence—Sufficiency.** In a prosecution for murder, the evidence held to justify a conviction of manslaughter in the first degree.

2. **CRIMINAL LAW—Excuse—Voluntary Intoxication.** Under Penal Code (section 2095, Rev. Laws 1910), voluntary intoxication is no excuse for crime.

3. **WITNESSES—Accused as Witness in His Own Behalf—Impeachment.** On a trial for murder where the defendant elects to testify as a witness in his own behalf, he may be asked on cross-exami-

nation as to an admission voluntarily made, that he committed the homicide, and, where he denies the same, testimony showing or tending to show such an admission is competent for the purpose of impeachment, when it appears that such admission was made voluntarily.

*Appeal from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Wesley Buck was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*John W. Willmott,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiff in error, Wesley Buck, hereinafter called "defendant," was informed against for the murder of Thompson Harjo, convicted of manslaughter in the first degree, and sentenced to be confined in the penitentiary at McAlester for the term of 12 years. To reverse the judgment rendered, he prosecutes this appeal.

The undisputed evidence in the case shows that the father of the defendant was shot by the deceased, who was prosecuted therefor and sent to the penitentiary; that about a week prior to the homicide charged in this case the defendant, a full-blood Indian, together with others, attended a "stomp dance"; that while the defendant was dancing the deceased and some of his relatives "purposely and on several occasions butted into" the defendant and interfered with his dancing, and thus bad blood was engendered between the defendant and the deceased; that about a week after said "stomp dance" the defendant and the deceased were together in' the town of Wewoka, and indulged, at the expense of the deceased, in drinking "Chock Beer"; they made two visits together to the house of a negro woman who was engaged in selling "Chock" for the

purpose of obtained the same; that, on the second visit to
and in said house, the deceased was struck upon the head
by the defendant with some instrument, from the effects
of which, about six or seven hours afterwards, he died;
that the wound inflicted upon the deceased, and from
which he died, was about one inch deep and an inch and a
half long, and from which matter—apparently brains—
exuded; that the appearance of the wound indicated that it
had been made with a hatchet or hammer; and that the
deceased was a much larger man than the defendant.

The facts surrounding the difficulty which resulted in
the homicide, and the instrument with which the wound
was inflicted, are in irreconcilable conflict; there being evi-
dence on the part of the state that without previous provo-
cation the defendant struck the deceased with a hatchet,
which belonged to the negro woman in whose house the
killing occurred, while the evidence on the part of the de-
fendant tended to show: That the deceased and the defend-
ant went together to said woman's house just prior to the
difficulty to get Choctaw Beer, defendant entering the
house in advance of the deceased, and that, without any
provocation on the part of the defendant, the deceased
said:

"I am Thompson Harjo. I am the man who shot your
father, and I can shoot you."

That the defendant then turned and faced the de-
ceased, and the deceased hit him right over his left eye and
knocked him back in the corner. That he would have fallen
if it had not been for the wall. That while he was falling
in the corner of the room the deceased was still coming at
him, and when the defendant was in the act of getting up
the deceased advanced upon him, and he shoved deceased
off, and, as the deceased was in the act of striking defend-

ant again, he seized something like a piece of stove wood about three feet long, which was lying near the wall of the room, and struck the deceased on the head. That the deceased again struck at but missed him, and at that time they were near the door of the room in which the difficulty occurred, and the defendant again struck the deceased, knocking him down, and he fell out of the door. That he did not strike the deceased with a hatchet. That "Josie" came in and told him to go home, and he threw whatever he had struck the deceased with down, and left, and that the instrument with which the defendant claimed to have struck the deceased had been looked for by the defendant and others and could not be found. That the defendant had never seen the hatchet in evidence in this case until he was in jail for the offense with which he is charged.

The defendant and his brother Joe were jointly charged with the murder of said Harjo, arrested, and confined in jail, and while so confined were taken to the sheriff's office and interrogated by the county attorney as to the facts surrounding the killing of said Harjo, and their statements taken by a stenographer and transcribed.

On the preliminary trial of the defendant and his brother for said homicide, the case was dismissed as to Joe Buck. On the trial Joe Buck was examined as a witness for the defendant, and, on the cross-examination of Joe Buck and of the defendant as a witness in his own behalf, the county attorney, against the objection and exception of the defendant, was permitted to refer to said transcript in conducting the cross-examination of the defendant and his brother, as to statements made by them when examined in the sheriff's office, and the county attorney was permitted to testify that prior to the commencing of said examination he said to the defendant:

"Wesley, you are charged with the crime of killing Thompson Harjo, and I want to know the facts about how you came to kill him. I want the truth free and voluntary, so that the same can be used in the trial of this case."

And to further testify, the defendant and his brother having denied on their cross-examination many of the statements alleged to have been made at their examination in the sheriff's office, that the defendant and his brother did at their said examination in the sheriff's office make the statements which on their cross-examination they later denied, the defendant testifying that, when the county attorney sought to secure a statement from him as to the killing of Thompson Harjo, he declined to make any statement "until he saw his lawyer."

The evidence further discloses that the defendant claimed not to know or to speak intelligently the English language, and that an interpreter was used in his examination at his trial, and that at the examination of defendant and his brother in the sheriff's office an interpreter was not used.

In the defendant's brief, he says:

"Under the above assignments we wish to present, for the consideration of the court, one proposition only, which is as follows: Reversible error was committed in admitting over the objection of the plaintiff in error, incompetent, irrelevant, and immaterial testimony."

And we will therefore confine our review of this case to said "one proposition."

In support of defendant's one proposition, he attacks as improper the action of the county attorney—in the absence of an attorney for the defendant—in examining the defendant and his brother in the sheriff's office, espe-

cially in view of the defendant's want of a knowledge of the English language, and the absence of an interpreter, and insists that the court committed reversible error in permitting the transcript of the alleged statement of the defendant and his brother to be referred to by the county attorney in the cross-examination of the defendant and of his brother, and by permitting defendant and his brother to be cross-examined for the purpose of impeachment upon immaterial statements alleged to have been made by them when examined in the sheriff's office.

That the defendant's admissions were voluntary is not disputed, and it appears that the material admissions of the defendant were in substance the same as the admissions in the defendant's testimony. There was no confession or admission of guilt, only admissions tending to show his participation in the commission of the homicide charged. By electing to become a witness in his own behalf, the defendant changed his status, for the time being, from defendant to witness. He was then entitled to the same privileges and was subject to be contradicted, discredited, and impeached the same as any other witness. It follows that the questions asked on cross-examination of the defendant and his witness, Joe Buck, were proper, nor was there any error in admitting evidence tending to show admissions voluntarily made by the defendant.

However, we do not wish to be understood as approving the practice indulged in by the county attorney in questioning the prisoners. The defendant is an Indian, who understands the English language only in a limited way, and he was entitled to have an interpreter and the advice of counsel before being asked to make any statements.

In the case of *Miller v. State,* 13 Okla. Cr. 176, 163 Pac. 131, L. R. A. 1917D, 383, it is said:

"It is elementary law that such statements must be entirely free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, in order to be admissible. The genius of our free institutions requires that admissions of the accused shall not be used against him, unless made voluntarily."

We fully appreciate the force of the following statement of the learned attorney for defendant in his brief in this case:

"It is an undeniable truth that liquor and the Red Man cannot stand together; one must triumph, and the other go down to defeat. There is no way to prevent crime among the Indians when liquor is present; and I hold that the man or woman who furnishes to these full-blood Indians, children of nature as they are, liquor which makes them mad, is more guilty of the crime committed than the Indian who actually does the deed."

But we are unable to see how the truth contained in said brief can, for any purpose, be considered by this court in reviewing the instant case, even admitting, which is not even suggested by the record, that at the time the homicide in this case was committed the defendant was made mad from voluntary intoxication, in view of section 2095, Revised Laws 1910, which reads:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition."

Having considered every proposition propounded by counsel for defendant, and having carefully examined the record with the purpose of discovering whether the defendant has been deprived of a fair and impartial trial,

within the meaning of the law, we have been unable to find that he has been deprived of any constitutional or other legal right. The negro woman was an eye witness of the tragedy, and if the jurors believed her testimony, as they had a right to do, they could not conscientiously do otherwise than find the defendant guilty, at least, of manslaughter in the first degree. The questions of fact having been determined by the tribunal whose solemn duty it was to ascertain them, and there being sufficient competent evidence to sustain the verdict, it follows that the judgment must be, and the same is hereby, affirmed.

DOYLE, P. J., and MATSON, J., concur.