# ED COLE v. STATE.

No. A-7127.   Opinion Filed March 15, 1930.
(287 Pac. 782.)

Wilkinson & Hudson, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J.   The plaintiff in error, hereinafter called defendant, was convicted in the district court of Pittsburg county of the crime of manslaughter in the first degree and sentenced to serve a term of eight years' imprisonment in the state penitentiary. It is from this judgment and conviction that he appeals.

The evidence of the state shows that Cliff Ward, the deceased, together with Joe Kinnikin and Jess Franks, had gone to the home of defendant on the Sunday evening of the homicide for the purpose of driving some hogs belonging to defendant, from his home to the town of Hartshorne; that Kinnikin and his partner, John Shaw, had arranged to buy these hogs from defendant on the Friday previous; that these parties arrived at defendant's home about sundown on Sunday evening; that defendant and Joe McMurtrey had been drinking heavily, and when these parties arrived at defendant's house, defendant was asleep on the porch; that later the parties all had supper at defendant's house; and that defendant passed the whisky and all the parties took a drink or two.  After supper, desiring more liquor, the parties went to Haileyville, and there defendant and McMurtrey bought some more whisky. That they stayed at Haileyville for several hours and drank some beer and whisky and started home in defendant's automobile with two or three bottles of whisky. On the way home they stopped several times to take a drink. When the car reached a point three or four miles distant from defendant's home, the defendant thought he saw a man hiding behind some trees or bushes, and remarked, "That is one of those damn Bales." (Bales being the name

of the man the defendant had killed and for which killing he was then on bail.) Defendant then pulled out his pistol and threatened to shoot at this object which he thought was a man, when Kinnikin took the gun away from defendant. Defendant remarked that that was a damn good gun and asked Kinnikin to shoot it, which Kinnikin did, four or five times. The defendant then gave Kinnikin some more shells and he reloaded the gun.

Before the parties reached defendant's house, an accident occurred in which the automobile ran into a ditch along the side of the road and threw the defendant into the windshield of the car and scratched him up considerably. This accident seemed to anger the defendant, and some cross words were passed by defendant to Kinnikin. The car was then pushed up into the road, when it was discovered that the steering apparatus was bent or broken and that the car could not be guided. The parties then started to defendant's house, which was about three-fourths of a mile from where this accident occurred. They walked together about one-half this distance, and then stopped again by the side of the road presumably to take a drink, and defendant started on towards his house. Defendant was very drunk and had to be supported in order to navigate. The deceased proceeded to take the defendant home from the point where they last stopped, the other parties remaining there.

When deceased and defendant had time to get about to defendant's house, several shots were heard, apparently from a Winchester or other large gun. Kinnikin ran up toward defendant's house and called for Ward. He received no answer until he got a little beyond defendant's house, when Ward yelled to him, "Here I am." By this time Franks had also reached the place and they both

helped deceased down the road. After these parties started back down the road, the defendant took several shots at them with his Winchester, but none of them hit the parties. Deceased was weak and bleeding profusely from a wound in his leg which had severed an artery. While Kinnikin and Franks were carrying deceased down the road, he told them that as soon as they got to the house defendant went into the house, got his Winchester, and came out immediately and shot at him without any provocation whatever; that he started to run away, and defendant continued to shoot at him; and that he shot him in the back of the leg while he was running away. Deceased bled to death from this wound within twenty or thirty minutes.

The defense interposed was self-defense, the defendant claiming that Ward had shot two shots at him from a pistol before he took any shots at him with the Winchester. Deceased was shot twice, once in each leg, the bullets entering the side of one leg and the rear of the other.

The court instructed fully on the law of self-defense, and not an exception was taken to any instruction given by the court. The instructions given are a model set and fully cover the law of the case.

It is first contended that the trial court erred in overruling the defendant's motion for a continuance. Under this proposition counsel for defendant have grouped the first, second, and third assignments of error contained in their petition in error. When the case was called for trial defendant was not present, and his counsel presented to the court a certificate of a physician to the effect that the defendant and his wife were both sick and unable to attend the trial and asking that the cause be continued on

that account. The court appointed two physicians to go and examine the defendant and his wife and report back to the court, which they did. Being sworn, both physicians testified that they had made a physical examination of the defendant and his wife, and that they were both physically able to attend court, and that they would not suffer any serious results from attendance on court at that time. After hearing this testimony and considering the certificate, the court overruled the application for continuance on this ground. Defendant and his wife were both present and testified at the trial. This court has held that the granting of a continuance on account of the illness of the defendant is in the sound discretion of the trial court, and the cause will not be reversed unless there appears to have been an abuse of this discretion. Harrison v. State, 29 Okla. Cr. 394, 234 Pac. 221; Nix v. State, 20 Okla. Cr. 373, 202 Pac. 1042, 26 A. L. R. 1053.

After the denial of the continuance on the ground of the alleged sickness of the defendant and his wife, counsel interposed an application for a continuance on account of the absence of certain witnesses, among whom was one Hattie Webb, who did not appear at the trial and who was alleged to be a material witness for the defendant. This motion was overruled and excepted to by the defendant. An examination of the record discloses that no diligence was shown to procure the attendance of this witness. The preliminary examination was held on the 14th day of October, 1927. The information was filed in the district court on the 18th day of October, 1927. Defendant was arraigned on the 16th day of January, 1928, and a list of witnesses to be used by the state served on him. The defendant therefore had from October 14, 1927, to February 1, 1928, to keep in touch with his witnesses and arrange to have them present at his trial.

The application for continuance does not show any likelihood that the defendant could have the witness present at the next term of court, and that of itself would be sufficient reason for denying the continuance and relieving the action of the court of being an abuse of discretion. Collins v. State, 15 Okla. Cr. 96, 175 Pac. 124.

The evidence of the witness Hattie Webb would have been cumulative of the testimony of the other witnesses who were present and testified in the trial of the case. It is not error to refuse to grant a continuance where the evidence of the absent witness is only cumulative. Seigler v. State, 11 Okla. Cr. 131, 145 Pac. 308; Petty v. State, 11 Okla. Cr. 646, 150 Pac. 91.

After the second application for a continuance was denied and the jury called to the box for the trial of the case, the defendant dictated into the record a motion to postpone the case on account of a certain news article purporting to recite the facts of the case which had appeared in one of the McAlester newspapers on the night before. There was nothing in the motion to establish that any prospective juror had read the article or had been in any manner biased or prejudiced against the defendant because of such article. In passing on this motion the court said: "In examining the jury, if any of them read this article and if they were influenced by it in any respect we will excuse them from the jury, probably it wasn't read by them, I don't know. Motion overruled, exceptions saved by the defendant to the ruling of the court."

The reason assigned in this motion constitutes no statutory ground for a continuance. There is nothing in the record to show that the defendant was prevented from procuring a fair and impartial jury by reason of the

fact that the McAlester paper published this article on the day before the trial commenced.

There is no merit in any of the grounds urged for a reversal of this judgment by reason of the action of the court in denying a continuance or postponement of the trial on any of the grounds presented.

It is next contended that the county attorney erred in stating in his opening statement of the case that the defendant had killed a man by the name of Bales and was under bond for said killing at the time of this killing. The county attorney in his opening statement was detailing what the evidence would be of the facts leading up to the killing, and said in substance that prior to the killing the defendant had drawn a revolver, and having it in his hand was threatening to shoot at what he thought was a man near a tree or some bushes, and said that he was a bad man and had already killed one man, and that Kinnikin took the gun away from defendant at that time. Further on in the statement, the county attorney said that when the defendant surrendered to the deputy sheriff he told him that Kinnikin had taken his gun away from him and told him, "You think you are a bad man," and talked to him about his former trouble in killing Jim Bales. The statement made by the defendant prior to the killing and at the beginning of the trouble was part of the res gestae, and as such was clearly admissible. The defendant took the witness stand and testified to practically that same state of facts in explanation of his trouble with the deceased and his associates.

The court on its own motion instructed the jury that the defendant was presumed to be innocent of the crime of killing Bales if he did kill him, and that the jury was not to consider that evidence for any purpose as tending to

establish the guilt of defendant of the crime in the case at bar. The statement being part of the res gestae, and the defendant having testified substantially to the same state of facts, and the court having fully protected the defendant in the instructions, the assignment presents no ground of error requiring a reversal of this case.

It is next contended that the trial court erred in permitting the witnesses Joe Kinnikin and Jess Franks to testify as to statements made by the deceased, Cliff Ward, during the shooting and at a time when the defendant was not present, without showing that the same were the dying declarations of the deceased.

The evidence shows that deceased was shot through the leg and an artery severed just before Kinnikin and Franks got to him, but had crawled through a wire fence quite a distance from the premises of the defendant and out into the public road. There was a streak of blood for over one hundred feet back from where the deceased was found on the defendant's premises. When Kinnikin got to the deceased, he was unable to walk and stated that he could not go. Then Kinnikin and Franks got hold of him and propped him up and carried and dragged him several hundred feet to the spot where he died. It was during this trip from where they first found him to the place where he died that he made the statement, "I just helped him up to the house and he just got his gun and started to shooting me." It appears from the record that during the time that Kinnikin and Franks were carrying the deceased, and during the time that he was making this statement, the defendant was continuing to shoot at the deceased, Kinnikin, and Franks. This evidence was clearly admissible as part of the res gestae. Morehead v. State, 12 Okla. Cr. 63, 151 Pac. 1183, Ann. Cas. 1918C, 416; Harper v.

State, 20 Okla. Cr. 48, 200 Pac. 879; Looper v. State, 42 Okla. Cr. 341, 276 Pac. 593.

It is next contended that the court erred in permitting the witness Frank Higgenbothen, who was called by the state to impeach the witness Kelly for the defendant, to go into details and tell that the witness Kelly claimed to have been robbed and caused the arrest of another man for robbery, and then afterwards admitted that he had lied about being robbed and had only told such a story for the purpose of protecting himself in a transaction in which he had gambled away certain money that belonged to the witness Higgenbothen. The state only asked the witness Higgenbothen as to the general reputation of the witness Kelly for truth and veracity, and Higgenbothen testified that he was acquainted with such reputation and that the same was bad. Thereupon counsel for defendant asked the witness if he had not had some trouble with Kelly over a business deal, to which the witness replied that he had. On redirect examination the state asked the witness to explain this trouble that he had had, and the court permitted him to say that the witness Kelly had embezzled some money belonging to Higgenbothen and reported that he had been robbed and afterwards admitted that he had lied and that he had done this to cover up his embezzlement. Since counsel for defendant opened up the question of trouble between the witness and Kelly, it was clearly competent for the state to inquire into the cause of this trouble that the jury might have all the facts.

The defendant next contends that the trial court erred in permitting the sheriff to testify to the purported statement made by the defendant immediately after the arrest and in also permitting the county attorney to read the unsigned statement and in permitting the county attorney to introduce the unsigned statement in evidence. The

record does not support this assignment of error. The court permitted the sheriff to refresh his recollection from this purported statement after he had testified that he was present when said statement was made and that the statement from which he was then refreshing his recollection was the correct statement of what the defendant had said at that time. The sheriff then testified under oath as to what the defendant had stated to him and the county attorney on the evening after the shooting, but the statement itself was not read to the jury or offered in evidence by the state.

The defendant next contends that the court erred in refusing to give requested instructions numbered 4 and 5. These instructions were properly refused, because there is no evidence in the record to support the theory upon which said instructions were based. Where the instructions given fully cover the law of the case and are as favorable to the defense as the evidence would warrant, it is not error to refuse to give requested instructions, although such requested instructions may embody a correct statement of the law. Preston v. State, 10 Okla. Cr. 514, 139 Pac. 528; Davis v. State, 15 Okla. Cr. 386, 177 Pac. 621; Welch v. State, 16 Okla. Cr. 513, 185 Pac. 119; White v. State, 42 Okla. Cr. 50, 275 Pac. 1067.

After having fully considered all the alleged errors relied upon for a reversal of this judgment, we are of the opinion that none of such errors are of the character that require a reversal of a case. The defendant appears to have had a fair trial; the evidence sustains the verdict of the jury. For the reasons stated the cause is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.