THOMAS O'SHEA, Appellant, v. GEORGE OPP.—111 S. W. (2d) 40.

Division One, December 14, 1937.*

*NOTE: Opinion filed at May Term, 1937, July 30, 1937; motion for rehearing filed; motion overruled at September Term, December 14, 1937.

Charles H. Mayer, Clayton Allen and Ed. Robison for appellant.

*H. B. Hunt, F. P. Stapleton* and *DuBois, Miller & Beavers* for respondent.

BRADLEY, C.—Action for $50,000 actual and $50,000 punitive damages for an alleged assault by defendant upon plaintiff. The verdict was for defendant, and after the usual steps, plaintiff appealed.

The petition is conventional. The answer is a general denial and a plea of self-defense.

Error is assigned on the admission of evidence; on the modification of plaintiff's Instruction 4; on giving defendant's instructions 1 and 4.

Both plaintiff and defendant resided in Rockport, Atchison County, and had so resided for several years. The alleged assault occurred in Rockport, August 23, 1934. Plaintiff was engaged in the retail lumber business in Rockport, and defendant operated a wholesale liquor store, a hotel and a place called The Rendezvous was operated by a sister of defendant's wife. All these were adjoining places and were in Rockport. Plaintiff and defendant had been friends through the years until in June, 1933, when they had a controversy about a lumber bill that defendant owed plaintiff. After that time, it is claimed by defendant, plaintiff pursued a course of unfriendliness towards defendant. Defendant offered evidence tending to show that in the interval between the lumber bill incident and the day of the trouble plaintiff had spoken of and about defendant as "a bootlegging son of a bitch," "a Dutch son of a bitch," "anything I can do to hinder Dade (defendant) I am going to do it," "I thought you (a person to whom plaintiff was speaking) were an honest man . . . well you can't be an honest man and work up at that god damned place (defendant's)," "If Dade expected to sell that automobile he had better keep the prospective purchasers away from me, because anything I can do to hinder the sale I am sure going to do it," "that anybody that had dealings with Opp, couldn't expect any business from him" (plaintiff), "I am going to get even with the damned Dutchman, the Dutch son of a bitch." Such expressions as "son of a bitch," "Dutch son of a bitch," were, according to defendant's evidence, frequently used by plaintiff when speaking of defendant. Such evidence as above stated got into the record, for the most part, by asking plaintiff about such on cross-examination. He denied making such statements. Then defendant

in presenting his evidence, introduced witnesses who testified that plaintiff had used such expressions as above when speaking of defendant. Also, defendant's evidence tended to show that he was informed, as to what plaintiff had said, in some instances by those to whom plaintiff had used such language.

Plaintiff admitted that he had twice called the sheriff of Lincoln, Nebraska, and had written one letter about liquor being loaded into automobiles at defendant's liquor store, and he admitted that he had taken the license numbers on cars in front of defendant's place of business, and that he had written a letter, concerning defendant and his business, to Edwin J. Becker, Missouri supervisor of liquor control. This letter was dated May 5, 1934, and was admitted in evidence. The letter reported that defendant ran "the local hotel and gambling den;" that he "has been selling liquor in cases and otherwise on the streets of Rockport; did so. city election day within 20 feet of the election booth;" that he "has a truck and other cars running between Rockport and Omaha, and other Iowa and Nebraska points." The letter asked the supervisor of liquor control to "send a real honest man up here a week, who can't get drunk and be bought off, and you can and will find a situation here that needs clearing up. He (defendant) makes the brag he has you fixed, which has been his plan of operation all of his life. Let us fool him." Mr. Becker sent a representative who made an investigation. This representative was a witness and testified to the effect that he found no support for the charges in the letter, and plaintiff admitted that he had based the letter on "general talk." Defendant testified that he learned, two or three weeks before the encounter, about plaintiff telephoning car license numbers to the Nebraska sheriff, and that he learned about the letter to the Nebraska sheriff the day prior to the trouble; and that he knew about the letter to the liquor supervisor some two or three weeks prior to the difficulty.

On the morning of the difficulty defendant and some of his friends were on and about the front porch of his hotel. Plaintiff went to the bank to see about a business matter. In going to the bank he went south on the east side of Main Street. Defendant's hotel and other places of business were on the west side of the street. As plaintiff was passing along on the east side of the street some one among those at defendant's hotel asked him, "who was telephoning those numbers in to the State officials at Lincoln, Nebraska?" (The person who made the inquiry had, as we understand, a newspaper in which was an item concerning the stopping of cars suspected of transporting liquor from Rockport into Nebraska.) Upon the inquiry being made defendant looked across the street, saw plaintiff and said, "There he goes right now." This interested friend, *eo instante*, became quite belligerent, got "out of his jacket" preparatory to phy-

sically chastising plaintiff and started across the street, but defendant stopped him. Defendant says that plaintiff, on his way to the bank, stopped on the east side of the street opposite or nearly so, from defendant's hotel, store, etc., placed a paper against a glass in a door and appeared to be writing something, and looking towards defendant's hotel, store and rendezvous. Defendant, the inference is, surmised that plaintiff was taking down license numbers on cars parked at defendant's hotel, etc. Plaintiff admitted doing some figuring at the time and place, but said he was figuring on the subject that was taking him to the bank. The bank he went to was on the west side of the street, but south of defendant's hotel. Plaintiff remained at the bank a short time and then crossed back to the east side and went north towards his place of business, carrying in his hand the papers concerning the matter that had caused him to go to the bank. Defendant saw plaintiff going north on the east side and according to his (defendant's) version, he started across the street "to ask Mr. O'Shea what was the idea of doing what he had been doing? Plaintiff met a friend on the sidewalk and stopped for a brief time and defendant, meanwhile, remained on the *north* side of an automobile parked, front like to the curb, till plaintiff came along. Plaintiff says that he was walking along "with my head down and saw a pair of legs there and I looked up and he (defendant) was right in front of me. . . . He was cursing and I said, 'Don't do that; don't do that,' and he ran right in and smashed me in the face." Defendant says that what he said to plaintiff when he (defendant) stepped upon the sidewalk was, "What in the hell do you mean? You letter writing, telephoning son of a bitch;" that thereupon, "he hit me . . . over the right eye. It shows a big knot there today." After the contact, according to plaintiff's version, he backed, or was backed south on the sidewalk, some twenty or more feet, when defendant threw him and his head struck a concrete or stone step at the entrance of a building, resulting in a basic skull fracture, and in addition, defendant hit plaintiff, when down and incapacitated from the fall, several severe blows in the face and about the head. The above is a resume of the facts disclosed in a somewhat lengthy record.

Plaintiff's counsel state in their brief that "the decisive and turning point in favor of the defendant and resulting in the verdict for the defendant in our opinion, was the admission" in evidence of the collateral matters, viz.: The disagreement about the lumber bill; what plaintiff said about defendant, according to defendant's case; the letter to the supervisor of liquor control; taking car license numbers; the telephoning and letter to the Nebraska sheriff and the evidence of the representative from the office of the State Liquor Control Department. Counsel for plaintiff say that all this went in

"over timely and proper objections and exceptions." We shall so accept the situation, but the objections actually were few. It appears, however, that it was understood, at least in some instances, that plaintiff was objecting and excepting to this evidence, and in some instances objections were made and exceptions saved.

Plaintiff contends that none of this evidence was admissible, but defendant says that the "statements and conduct" of plaintiff were admissible (1) to affect the credibility of plaintiff, that is, to impeach him as a witness; (2) that such evidence was competent on the point as to who was the aggressor; (3) on the question of punitive damages.

Lehman v. Lambert, 329 Mo. 1147, 49 S. W. (2d) 65, was for assault and battery. Punitive damages were not sought. The answer was a general denial, and further, "that while he admits that he struck plaintiff at the time alleged in the plaintiff's petition, he denies that such striking was unlawfully, willfully, maliciously and feloniously done, but avers the fact to be that he went to see plaintiff on a lawful mission, with a peaceful purpose, and to urge upon plaintiff that he cease and desist from using profane and vulgar language and in making insulting remarks in the hearing of the wife and daughter of the defendant and that in his attempt to talk to the plaintiff and reason with him about his offensive and unlawful conduct toward the family of the defendant, the plaintiff became enraged and suddenly reached for and sought to strike the defendant with a wrench or other dangerous and deadly weapon which he was carrying upon his cultivator, and defendant, realizing his peril and danger, was forced to and did strike the plaintiff in the necessary defense of his own person, and for his own safety, and that, in so doing, he used no more force than was necessary to repel plaintiff's assault upon himself."

And defendant, in the Lehman case, further pleaded in his answer that for a long time prior to the alleged assault plaintiff "had persisted in using profane and vulgar language and making insulting remarks in the hearing of the wife and daughters of defendant, and would take advantage of the absence of defendant from his home to thus humiliate, degrade and put in fear the wife and daughters of defendant, and defendant further says that his said family, by reason of the conduct and actions aforesaid of the plaintiff were put in fear and were greatly distressed and worried and reported the various acts and conduct hereinabove alleged of the plaintiff to this defendant, and, in order to get relief for his family from the taunts, insults, profane and vulgar language used by plaintiff, purposely, willfully and wantonly, as aforesaid, in the hearing of his said wife and family, and purposely directed by plaintiff toward them as an insult to them and to this defendant, this defendant was

driven to the necessity of seeking plaintiff out, as he did do, to induce plaintiff to cease and desist from his aforesaid mentioned acts and conduct. . . ."

Plaintiff Lehman moved to strike the last above-quoted portion of the answer, but the court overruled the motion. Defendant was permitted to offer evidence tending to prove the allegations of that portion of the answer which the court refused to strike. It was held that the motion to strike should have been sustained and that the evidence should have been excluded. The nature of the background, in legal principle, that impelled defendant in the present case to the place of the encounter is strikingly similar to the background that impelled the defendant in the Lehman case to the place of encounter. It was contended by the defendant in the Lehman case that the evidence of Lehman's offensive acts and of the use by him of opprobrious language in the view and hearing of defendant's wife and daughters was admissible "as tending to show plaintiff's hostility to defendant, and consequently the reasonableness of the latter's apprehension of danger when he saw plaintiff reach for the wrench on the cultivator." The court disposed of this contention thus: "If plaintiff's previous conduct, which had been so offensive to defendant's wife and daughter, evidenced hostility to defendant, the latter knew it when he picked up the butt end of the blacksnake whip on his way to interview plaintiff. Yet he says that he did not know why he took the whip. When he saw plaintiff reach for the wrench, did this same previous conduct of plaintiff come into his mind? Not at all. It merely occurred to him that plaintiff had once knocked another fellow in the head, and therefore, he had better strike first."

In the present case defendant made no claim that he struck plaintiff because of plaintiff's previous conduct. His claim is that he only struck plaintiff because plaintiff first struck him, and that all he did was in the defense of his own person. "Peace and good order and the rules of civilized society forbid that individuals shall right their own wrong." [2 R. C. L., sec. 33, p. 554; Lehman v. Lambert, supra.] If the matters and things about which plaintiff was asked on cross-examination were immaterial and incompetent, defendant could not, under the guise of impeachment, get such evidence before the jury.

In the Lehman case defendant says he struck because Lehman "reached for a wrench and I knew he had knocked a fellow in the head just before that. . . . So I struck him. . . ." And, as stated, in the present case, defendant struck plaintiff because plaintiff first struck him. We can perceive no difference in principle between the evidence here complained of and the evidence held incompetent in the Lehman case, even though the subject of punitive damages was not involved in that case. There was nothing in any of the

evidence, which defendant says is competent, that tends in the remotest degree to show that plaintiff had made any threats to inflict upon defendant any *bodily* harm. Proof of threats to do bodily harm are competent, when not too remote, as tending to show who was the aggressor in an encounter. This will be conceded and does not require citation of authorities, which are numerous, and none to the contrary. But we have no such situation here. We are clear that the complained of evidence was wholly incompetent so far as concerns actual damages.

Nor do we think any of this evidence was competent in mitigation of punitive damages. Except the circumstance giving rise to defendant's *surmise* that plaintiff, on the morning of the trouble, and shortly prior thereto, took down car license numbers on cars parked in front of defendant's places of business, and the news item, whatever it was, all these alleged mitigating things were too remote to be competent. All these things except defendant's surmise about license numbers on the morning of the trouble, and the news item, were prior to the day of the encounter, and nearly all of them long prior, when measured by the time a reasonable man's passion should, within the view of the law, subside, after having been aroused, even by severe provocation. And the circumstance about the car license numbers and the news item, on the morning of the trouble, was not, we think, of sufficient substance to excite the passion of a reasonably ordered mind. Defendant only surmised that plaintiff was taking down car numbers. Also, the record does not disclose the contents of the news item. We are not unmindful of defendant's claim, and which his evidence tends to support, that plaintiff had pursued a course of conduct towards defendant, which might excite his passion and create in his breast a feeling of resentment. But the policy of the law undoubtedly is that one may not redress his own wrongs, real or otherwise. The subject of admissible provocation to mitigate punitive damages in an assault and battery case is considered at some length in Bond v. Williams et al., 279 Mo. 215, 214 S. W. 202. In that case it appears that an attorney was suing for damages resulting from an assault upon him, provoked by language used in argument to a jury. The plaintiff in that case, in his argument, characterized the defendants, and in their presence and a number of others, "as liars and perjurers." The assault occurred shortly thereafter, exact time not shown, but perhaps not exceeding an hour and a half. The verdict was for defendants. In that case the provoking circumstance was held to be competent, but the court said (214 S. W. l. c. 204): "In an action for damages caused by assault and battery it is always permissible to show the circumstances under which the alleged assault was committed. Where punitive damages are asked, whether malice was present is an issue, and it

is permissible to show the circumstances of provocation in mitigation of such damages, though such evidence is inadmissible in mitigation of actual damages. [Joice v. Branson, 73 Mo. 28; Gray v. McDonald, 104 Mo. 303, l. c. 314, 16 S. W. 398.] ▮ In order, however, that evidence of provocation, such as abusive language, may be introduced for the purpose of mitigation, the provocation must have occurred at the time of the assault, or so recently as to warrant an inference that the defendant was still laboring under the excitement caused by it. . . . The authorities are not altogether in agreement as to what would be sufficient time for the passions aroused by such a provocation to subside so that it would be presumed the assault was deliberate; that is, they do not set definite limits for a period designated as a 'cooling time.' "

As pointed out in the Bond case, the general rule is "that the length of time necessary to remove the excuse of provocation depends upon the circumstances of each case." "No precise time, therefore, in hours or minutes, can be laid down by the court, as a rule of law, within which the passions must be held to have subsided and reason to have resumed its control, without setting at defiance the laws of man's nature, and ignoring the very principle on which provocation and passion are allowed to be shown, at all, in mitigation of the offense." [Maher v. People, 10 Mich. 212, 81 Am. Dec. 781.] While no precise period can be laid down for the "cooling time," such period should be only of reasonable duration under the circumstances, if the wholesome rule that one may not redress his own wrongs is to prevail.

In Coxe et al. v. Whitney, 9 Mo. 527, it appears that a newspaper editor published an article reflecting on defendant's wife. The article follows: "Another Affair: We learn that the wife of an officer of one of our public institutions, residing up town, was sent from home last evening by her husband, in company with her *gallant*—the lady having given very unequivocal evidence of her preference for her new lover. The gentleman with whom she left, has been, as we learn, a resident in the family during some months past. 'Tis said they left the house arm in arm, with the most perfect resignation and nonchalance." Two days later the defendant made the assault. The matter of provocation was held to be inadmissible. In ruling the point the court quoted with approval from See v. Woolsey, 19 J. R. 321, as follows: "In an action for assault the evidence of provocation which is allowed to mitigate the damages, must be so recent 'as to induce a fair presumption that the violence was done during the continuance of the feelings and passions excited by it. On any other principles the law would countenance the most revengeful feelings, and indirectly also an appeal by persons conceiving themselves injured to force and violence.' " And in the Coxe case

is this: "The law out of respect to the frailty of human passions, may look with an eye of some indulgence upon the violation of good order, produced in the moment of irritation and excitement from abusive language. But where there has been time for deliberation, the peace of society requires that men should suppress their passions, and neither reason or law will suffer them to claim a diminution of their responsibility for their misconduct. . . . But *ira furor brevis est*: what is done twenty-four or forty-eight hours after the provocation received, is not the result of that passion, but is the deliberate infliction of vengeance for an injury real or supposed, and this spirit of retaliation, however consonant it may be to the customs of society, the law does not countenance or tolerate." [See also, Endicott v. Robertson, 211 Mo. App. 508, 244 S. W. 947; Haley v. Walker (Mo. App.), 12 S. W. (2d) 759, and Shoemaker v. Jackson (Iowa), 1 L. R. A. (N. S.) 137, and note.]

"To entitle defendant to offer circumstances of provocation in mitigation of damages, their occurrence must have been so recent and immediate as to induce a presumption that defendant's act was committed under the immediate and continuing influence of the excitement and passion excited thereby. Where the assault is committed after a time for reflection and deliberation, or in revenge, evidence of provocation is inadmissible." [5 C. J., p. 678, sec. 199 ee.]

The subject of the admission of evidence of provocation to mitigate punitive damages in an assault and battery case is thoroughly considered, and numerous authorities cited in the Bond case, supra, and a further discussion here could be no more than repetition. In view of the remoteness of the alleged mitigating facts and circumstances, we are constrained to rule that such were wholly incompetent on the question of punitive damages as well as on actual damages.

Plaintiff's Instruction 4, as requested, was (minus the word great, which was have italicized), as follows: "The court instructs the jury that if you find and believe from the evidence that the defendant willfully sought out the plaintiff with the willful intention of provoking a difficulty with him, and that the defendant did provoke a difficulty with the plaintiff with the willful purpose of taking advantage of him and of doing him some *great* bodily harm in order to avenge some real or fancied prior wrong, then, even if the plaintiff did attack the defendant, the defendant, nevertheless, if you find he struck the plaintiff with his fist, was guilty of an assault upon the plaintiff."

The court modified the instruction by inserting the word *great* and of this plaintiff complains. In State v. Painter, 329 Mo. 314, 44 S. W. (2d) 79, l. c. 82, the court ruled that "if defendant sought and entered into the difficulty for the purpose of inflicting upon the deceased death or great bodily harm, he thereby lost the right to

invoke self-defense. If he sought or voluntarily entered into the difficulty without such felonious intent, he would still have what has sometimes been termed the right of imperfect self-defense, not a complete exoneration, but which would reduce the grade of homicide to manslaughter." Supporting this statement of the law the court cited State v. Gilmore, 95 Mo. 554, 8 S. W. 359; State v. Partlow, 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31; State v. Roberts, 280 Mo. 669, 217 S. W. 988. Thus it appears that if the facts were found as hypothesized in plaintiff's Instruction 4 as *requested,* defendant still would have had the imperfect right of self defense, but not "complete exoneration." Under the instruction as modified, the jury could have believed that defendant intended to give plaintiff a good thrashing, commit common assault, yet he would be guilty of no wrong, under the modified instruction, if he struck only *after* plaintiff struck. If such were so, then any one who desired to and could physically chastise another, could seek but such other, as predicated in the instruction as modified, provoke the other to deliver the first blow, and then lash him just short of a felony, and be immune from legal consequences in an assault and battery case. Clearly, we think, it was error to so modify plaintiff's Instruction 4.

Defendant's Instruction No. 1 follows: "The court instructs the jury that the right to defend one's self from danger is known under the law as the right of self-defense and is a right which the law not only concedes, but guarantees to all men.

"If, at the time of the fight mentioned in evidence, defendant had reasonable cause to believe there was on the part of plaintiff a design to do him some *great* personal injury, and there was reasonable cause for him to apprehend immediate danger of such design being accomplished and to avert such apprehended design, defendant did strike and fight plaintiff and at the time he did so, defendant had reasonable cause to believe and did believe it was necessary for him to do so to protect himself from such apprehended danger, then, and in that case, defendant's acts were justifiable, and you should find for him on the ground of self-defense. It is not necessary to this defense that the danger should have been actual or real, or that the danger should have been impending and immediately about to follow. All that is necessary is that defendant had reasonable cause to believe and did believe these facts, unless you believe and find from the evidence that the defendant brought on the difficulty for the purpose of doing plaintiff *great* bodily injury as defined in another instruction given you herein." (Italics ours.) This instruction was on defendant's theory of self-defense, and is correct, we think, assuming that the facts justified the use of the word *great* in next to the last line. Plaintiff contends that this instruction should have further said: "On the other hand, it is not enough that defendant should have

so believed. He must have had reasonable cause to so believe. Whether or not he had reasonable cause is for you to determine, under all the facts and circumstances given in evidence. If you shall believe, from the evidence, that defendant did not have reasonable cause to so believe, you cannot acquit him on the ground of self-defense, although you may believe that the defendant really thought that he was in danger.'' Plaintiff relies upon State v. Gee, 85 Mo. 647. The instruction in the Gee case had in it the above-quoted language, but the instruction was not in question and the court did not rule that such language was necessary.

Such language, as appears in the instruction in the Gee case, is sometimes in self-defense instructions offered by the State, but we know of no case holding that the omission of such would be reversible error. Other complaint is made on this instruction, but such, we think, is without merit. However, in view of our ruling as to the modification of plaintiff's Instruction No. 4, the word *great* in next to the last line in defendant's Instruction No. 1 should be omitted, and if defendant desires, the word *great* in the fourth line may be omitted.

Defendant's Instruction 4 was predicated on the theory that plaintiff struck the first blow, and told the jury that the opprobrious language used by defendant immediately before the encounter, did not justify plaintiff in striking. The instruction then goes on to tell the jury that if they found plaintiff struck the first blow, defendant had the right to use all the force that appeared reasonably necessary to protect himself, and the instruction concludes with this language: ''Unless you 'believe and find from the evidence that the defendant brought on the difficulty for the purpose of doing plaintiff *great* bodily injury as defined in another instruction given you herein.'' (Italics ours.) The word *great* should be omitted from the concluding part of this instruction.

The judgment should be reversed and the cause remanded and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.

*NOTE: Opinion filed at May Term, 1937, July 30, 1937; motion for rehearing filed; motion overruled at September Term, December 14, 1937.