## GILLASPY v. STATE.

No. A-11676. March 18, 1953.

(255 P. 2d 302.)

348

Sigler & Bruce, Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, J. O. Gillaspy, defendant below, was charged by information in the district court of Carter county, Oklahoma, with the crime of the murder of Rex Stowe on the 19th day of November 1950, allegedly committed at County Line, Oklahoma, within said county. The offense was committed by shooting Rex Stowe in the left breast with a Colt army 45 pistol, which resulted in Stowe's death. The defendant was tried by a jury, convicted of first degree manslaughter, his punishment fixed at 5 years in the State Penitentiary, and judgment and sentence entered accordingly, from which this appeal has been perfected.

A brief resume of the facts may be of aid to understanding the issues herein involved. It appears the defendant, J. O. Gillaspy, worked as a rough neck with a drilling crew over which Stowe was tool pusher. This relationship existed about 6 or 8 months prior to the killing and there was nothing in the relationship prior to said time which would indicate any bad feeling between the parties. The decedent was a married man with a wife and 2 children, both girls, 7 and 10 years of age. The decedent and his wife had been married 14 years but decedent's wife lived at Garden City, Kansas, while he stayed in Duncan, making periodic visits to see his family. The record shows he provided for them by endorsing his payroll checks over to them and he lived off his expense account. It appears, however, that he was smitten with the defendant's daughter, Audrey Barnett, who had theretofore been married. The record discloses that Audrey ran over a Negro boy in Duncan in an automobile, was convicted of said crime and sentenced to the penitentiary. However, at the time herein involved, she was back home apparently on parole when the things herein complained of occurred. The record shows Stowe had interested himself in her defense, and paid at least a part of her attorney's fees. After returning to Duncan he provided her with an apartment spending many nights with her in the same. On the day in question Stowe returned from Childress, Texas, with Audrey Barnett and they had an argument about the future course of their relations, during which Stowe saw her father at the drilling rig the morning of the killing and told the defendant he was "through with Audrey, that they had quit", and he had left her in Duncan and that the defendant had better go to get her. Together with Ray White and Velma Crummey, the defendant went to Duncan for Audrey. On arrival at her apartment they found she was not there but were informed she could be located at the Snow White Tavern. This information proved to be correct. She was located at the tavern where she was engaged in drinking beer. The defendant and the people with him took Audrey in the car and drove to County Line. Here they met Rex Stowe at the back of White's car as they got out. At this time it was getting dark. They congregated on Sanders' Store porch near which their cars were parked. A little while later they went across the street to a cafe where the defendant's daughter engaged in some loud singing. The defendant apparently became apprehensive because of her status and, because of his concern about her, he attempted to take her home. The proprietress of the cafe interceded in her behalf and stated that she was all right and that she was not getting too loud. The record discloses, however, she was drunk, in fact, they were all drinking, but as the defendant put it they were "not too drunk". Later, however, the defendant, his

daughter Audrey, Velma Crummey and Rex Stowe, the decedent, came out and walked back to the Sanders' Store porch. The defendant took her by the arm to lead her home only about 50 steps away. Rex Stowe jumped up and intervened on behalf of Audrey who remonstrated saying she did not want to go home. The defendant insisted he was taking her to the house, and the decedent insisted he was not. The decedent Stowe, an ex-prize fighter, threatened to whip the defendant saying, "I will whip your * * * out". The defendant replied that he was too old to fight Stowe but Stowe struck at the defendant who dodged and fell to his knees. Stowe and defendant's daughter left together, and defendant left to go to his home and get his pistol. A few minutes later he came back armed with his Colt 45 army automatic. He met his daughter and Stowe who was also armed with a .22 rifle. The record discloses that Stowe had been carrying this rifle in his car for some time. The defendant informed Stowe he came after his girl, but Stowe responded, "You * * * old son of a bitch, I came to kill you. I can kill you with my bare hands", all the time shoving the defendant backwards. The record shows that Stowe cursed the defendant and struck him with his elbow, and the defendant then drew his pistol and shot Stowe. The record further shows the decedent Stowe was overbearing when drunk but was otherwise a peaceable citizen. Moreover, it appears the defendant except for only possibly one fight of little consequence was also a peaceable citizen. The defendant testified he believed his life was in danger, but he only intended to shoot Stowe in the arm, it was not his intention to kill him.

The defendant filed a brief herein urging 8 assignments of error. The state has failed to file a brief herein. We presume its failure so to do is prompted only by the clear evidence of reversible error herein involved. The first assignment of error is that the trial court erred in overruling the defendant's motion for a continuance. This contention was predicated upon the proposition that on the day prior to the trial the county attorney gave to the Daily Ardmoreite an extended interview, in which he detailed what the evidence would be, and that he would ask for the death penalty. It developed at the trial he did not ask for the death penalty. The defendant charges his right to a fair and impartial trial was prejudiced by the article that appeared in the Ardmoreite. The record wholly fails to support this assignment of error. No where in the record is the charge of prejudice supported by any evidence other than the article attached to the motion. It does not appear that any prospective juror read the article or had been in any manner biased or prejudiced by it, and no attempt appears of record to establish that such was the case. Cole v. State, 46 Okla. Cr. 365, 287 P. 782, wherein it was held under similar conditions:

"The granting or refusing of a continuance in a criminal case is largely a matter within the discretion of the trial court; this court will not reverse a judgment on account of the overruling of a motion for a continuance unless an abuse of discretion is shown."

This contention is therefore without merit.

The second assignment of error is that the trial court erred in not directing a verdict for the defendant. It will not be necessary to consider this assignment of error at this particular point for the reason that the same will be resolved by a treatment of the other assignments of error hereinafter made. In any event, under the provisions of Title 21, § 711, O.S.A. 1941, subsection 3, (manslaughter in the first degree), the question of whether the defendant unnecessarily killed Stowe while Stowe was attempting an assault on him with the .22 rifle, was a question of fact to be determined by the jury.

The defendant's third contention is that the court erred in refusing to grant a new trial on account of the misconduct of the county attorney. The misconduct complained of consists in the state's offering certain witnesses such as

Ray White and Grady Gossett whom the county attorney treated as hostile witnesses not upon the ground of surprise but ostensibly to show the relation of the parties. He proceeded to discredit the witness White in the eyes of the jury by asking questions concerning matters occurring at the preliminary trial, which matters bore no relation to the crime herein involved, but which reflected on the witness, such as that he was married and he had seen a lot of Velma Crummey, a woman who was not his wife, and the further fact that he had been out with her every day, and that together they had done some drinking. The real issue was not a trial of White's morals but of the defendant on the crime charged. This cross-examination by the state of its own witnesses was highly improper as being on collateral matters wholly unrelated to the crime involved, and was not matter admissible as criminative evidence, 70 C.J. 1046, § 1238; Willis v. State, 13 Okla. Cr. 700, 167 P. 333; and further was improper impeachment since it was not based on a showing of surprise, and not limited by proper instructions to the jury, hereinafter discussed. By discrediting White the state apparently, also hoped to reflect on the defendant.

Furthermore, the defendant complains of the misconduct of the county attorney in offering Grady Gossett as a witness for the state, whom it appears for 22 years had been postmaster at County Line, Oklahoma. The county attorney contended at the outset of offering this witness that he had changed his testimony. The county attorney made no showing of surprise. In fact, before the witness was interrogated on any point the county attorney offered him as a hostile witness stating that his testimony had changed. On this showing being made the defendant asked for a mistrial which was promptly overruled by the trial court. Thereafter the trial court permitted the witness to testify and then permitted his impeachment from the preliminary record. It appears that the trial court permitted it not alone on the theory of changing his story and hostility but also upon the theory of refreshing his memory. It appears, however, to have accomplished the purpose of impeachment. In this connection the testimony of Grady Gossett was in relation to a material matter. The gist of the question asked of Gossett was, if Gossett saw a gun (across the body of Stowe). Gossett answered, "There was a gun, but I don't know what position it was in. When I walked across the street the gun was there, and Jim was there and his daughter, and nobody else was there". The preliminary record was produced to show that a similar question was answered by the witness to the following effect, "there could have been one but I didn't see it because Audrey was down over the body". The implication of this attempted impeachment of the state's own witness is powerfully evident when considered in light of the testimony of Mr. Crosby, deputy sheriff and fingerprint expert to the effect that he found the fingerprints of Audrey Barnett on the gun. He further testified there were smudges on the gun but the only ones he could identify were the fourth finger, the index finger, the middle finger and the thumb of Audrey Barnett's right hand. He related that was the only clear print he could get from the gun. Thus the obvious purpose of this impeachment of this state's witness was to leave the matter to the jury's surmise that possibly the decedent Stowe never had the gun but that it was placed across the body by Audrey to create an impression of a necessitous killing by her father. This impeachment of the state's own witness was highly improper. In this connection it has been held in Wiese v. State, 47 Okla. Cr. 59, 287 P. 1099:

"A party cannot impeach his own witness by introducing in evidence conflicting statements made by him, unless he should testify injuriously to the party placing him on the stand, and, if the witness does not testify as the party expected him to do, affords no ground for the introduction in evidence of previous contradictory statements made by such witness."

Moreover, the trial court erred in not limiting the consideration by the jury of this evidence. In Wiese v. State, supra, on this point it was said:

"When contradictory statements made by a witness are admissible in evidence for the purpose of impeaching him, they must be confined to contradictions of the testimony of the witness which are injurious to the party seeking to impeach him, and it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent substantive evidence against or in favor of the defendants, and that the jury can only consider such contradictory statements for the purpose of affecting the credibility of the witness, if the jury decides that such statements do have this effect, and it is unlawful for the jury to consider said statements for any other purpose." Akins v. State, 91 Okla. Cr. 47, 215 P. 2d 569.

Furthermore, the procedure herein followed was contrary to the rule as announced in Darden v. State, 42 Okla. Cr. 6, 273 P. 1027. Here the state was not misled or deceived in placing any of the foregoing witnesses upon the stand. Nevertheless, he was permitted to impeach each of them and discredit them in the eyes of the jury. In Darden v. State, supra, the rule in this regard was announced as follows:

"A party cannot impeach his own witness by proof of prior contradictory statements, where such party has not been misled or deceived into placing such witness on the stand. A party may impeach his own witness only where he has been deceived or entrapped into placing a witness upon the stand, having reasonable ground to believe, and believing the witness will testify to a favorable state of facts, and who then testifies unfavorably, contrary to the belief of the party placing him upon the stand."

.Therein it was further said:

"No predicate, however, was laid by the state for the impeaching questions. On the contrary, the record indicates that the counsel for the state was fully aware what the testimony of the witness would be before he was called to testify. It is well settled that, where a party is entrapped or deceived into placing a hostile witness on the stand, who then testifies contrary to the statements made, and to the belief of the party calling him, he may be impeached by the party calling him. On the other hand, a witness cannot be called to the stand, by a party knowing what his testimony will be, and then be impeached by showing he has made contrary statements. Evidence to prove a substantive fact cannot be introduced by a purely hearsay statement under the guise of impeaching a witness. Sturgis v. State, 2 Okla. Cr. 362, 102 P. 57; Culpepper v. State, 4 Okla. Cr. 103, 111 P. 679, 31 L.R.A., N.S., 1166, 140 Am. St. Rep. 668; Paris v. U. S., 5 Okla. Cr. 601, 115 P. 373; 2 Wigmore on Ev. § 904, subd. 8.''

At no time in the impeachment of the state's own witnesses did the trial court ever instruct the jury that none of the contradictory statements could be considered as substantive evidence of guilt. In this connection, in Wiese v. State, supra, is was held:

"* * * it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent substantive evidence against or in favor of the defendants, and that the jury can only consider such contradictory statements for the purpose of affecting the credibility of the witness, if the jury decides that such statements do have this effect, and it is unlawful for the jury to consider said statements for any other purpose."

To the same effect is Leeks v. State, 95 Okla. Cr. 326, 245 P. 2d 764. See, also, Broshears v. State, 17 Okla. Cr. 192, 187 P. 254; Flauhaut v. State, 66 Okla. Cr. 417, 92 P. 2d 587; Bond v. State, 90 Okla. Cr. 110, 210 P. 2d 784, and Fleetwood v. State, 95 Okla. Cr. 163, 241 P. 2d 962. In light of the foregoing authorities, we are of the opinion that the conduct of the county attorney in impeaching his own witnesses, without an instruction of the court limiting the same to the witnesses' credibility, and further instructing the jury that such evidence should in no sense be considered as original evidence against the defendant, constituted reversible error.

The defendant further complains, when he took the witness stand in his own behalf, the county attorney sought to impeach his testimony, with not only his written and signed statement given in the county attorney's office, but also with his wire recorded statement given likewise, after defendant's arrest. It is well we note that a few contradictions appear in the written statement and the wire recording and the defendant's sworn testimony in the trial on the merits. These contradictions were such as in his sworn evidence at trial that he, defendant, went to the house after the first altercation with Stowe to get his gun only for protection and he didn't go down there with the idea of killing anybody. He thought he might stand him (Stowe) off long enough to get the girl away. Whereas in the written statement he related, "when he got the pistol he believed he would have to use it". In the wire recorded statement, the defendant said that he got his pistol to bring the kid (Audrey) back home; he didn't want to shoot Stowe but "wanted to push him back until he got her to the house". These are characteristic of the conflicts in the statements made by the defendant on the occasions prior to trial on the merits. In connection with the cross-examination of a defendant, in Lane v. State, 91 Okla. Cr. 107, 216 P. 2d 353, we held, he (the defendant), like any other witness, may be asked questions pertaining to the matter at issue or that would go to his credibility as a witness. His cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. He may be asked questions for the purpose of testing his memory, affecting his credibility and the weight of his testimony. Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438. The attempted impeachment of the defendant herein was proper. Most all the things covered in the cross-examination were predicated on discrepancies appearing in the written statement and the wire recorded statement, as against his sworn testimony in the trial in chief, in relation to the material facts of the killing and constituted a proper matter of inquiry on cross-examination as admissions against interest, and are admissible as such, as substantive evidence against the defendant. Haddock v. State, 64 Okla. Cr. 353, 81 P. 2d 339; Buck v. State, 16 Okla. Cr. 356, 182 P. 913; Harrold v. Territory, 18 Okla. 395, 89 P. 202, 10 L.R.A., N.S., 604, 11 Ann. Cas. 818. Therefore the cross-examination on these matters did not come within the rule of limitation as it applied to witnesses White and Gossett.

The defendant's fourth, fifth, sixth and seventh assignments of error related to the trial court's instructions Nos. 6, 7, 8 and 9 which he contends limited the defendant's right of self-defense to an apprehension that the decedent Stowe was "about to commit a felony on him and that the defendant was in danger of receiving great bodily harm" at the hands of the decedent. The defendant relies on Johnson v. State, 59 Okla. Cr. 283, 58 P. 2d 156, wherein the defendant, because of the court's instruction, was denied his right of self-defense, but not on the ground as herein asserted by the defendant. The facts therein disclose the killing to have been the result of hitting the decedent with his fist, knocking him down, so that his head hit the pavement resulting in a fracture of the skull and consequent death. The trial court's instructions limited the right of self-defense in the case to "reasonable apprehension of a design to commit a felony, or to do some great personal injury", which this court said was error, in that it denied the defendant the right accorded him under "the statute to defend himself against any assault about to be committed upon or against him". In short, it precluded his right to defend against a simple assault and battery, and hence was erroneous. Here the assault being made on the defendant was not a simple assault but with a .22 rifle, a deadly weapon, Title 21, § 645, O.S.A. 1941, with an expressed threat to kill, "You old no good son of a bitch, I came to kill you". If this had been a case involving a simple assault, on the defendant by Stowe, then the Johnson case would apply. Moreover, the reversal in Johnson v. State, supra, was not predicated on the use of the word "great" as indi-

cated by the defendant herein, relying on O'Shea v. Opp, 341 Mo. 1042, 111 S.W. 2d 40, for the use of "great" interchangeably with "serious" has been approved in Oklahoma in connection with proper instructions on self-defense. Sherman v. State, 20 Okla. Cr. 306, 202 P. 521. Furthermore, instruction No. 6 reads as follows:

"As applicable to the facts in this case, homicide is justifiable when committed by any person in resisting any attempt to murder such person, or to commit any felony upon him, or when committed in a lawful defense of his person when there is a reasonable ground to apprehend a design to commit a felony against him, or to do him great personal injury, and there is imminent danger of such design being accomplished."

The foregoing instruction has been approved verbatim in Brantley v. State, 15 Okla. Cr. 6, 175 P. 51, as instruction No. 7 therein. Instruction No. 6 herein merely constitutes a statement of the statutory grounds or definition of justifiable homicide, Title 21, § 733, O.S.A. 1941, to the effect, homicide is justifiable "When resisting any attempt to murder such person, or to commit any felony upon him, * * * or to do some great personal injury, and imminent danger of such design being accomplished". Instruction No. 7 is in substance the same as instruction No. 6 except in addition thereto setting forth that the defendant's defense was justifiable homicide on said grounds. Both of said instructions, in substance, having been approved heretofore, in a case of this character, were properly given. Instruction No. 8 reads as follows:

"It is not necessary under the law that a person shall in fact be in imminent peril of his life being taken or of offering great bodily injury before acting in self-defense, but if the jury finds that the defendant had reasonable grounds for believing and did believe, from the facts and circumstances as they reasonably appeared to him at the time, that the danger was so urgent and pressing, or apparently so urgent and pressing that he could not avoid the necessity for killing in safety to himself and save himself from death or great bodily injury at the hands of the deceased, and under such circumstances the killing occurred then it would be justifiable homicide."

Instruction No. 8 herein has been approved almost verbatim in Brantley v. State, supra, 15 Okla. Cr. 14, 175 P. 51, as instruction No. 11 therein given. Also see the same instruction as approved in Gray v. State, 56 Okla. Cr. 208, 38 P. 2d 967, and in Turpen v. State, 89 Okla. Cr. 6, 204 P. 2d 298; Turner v. State, 4 Okla. Cr. 164, 189, 111 P. 988. Hence, this instruction was properly given. Likewise, instruction No. 9 reads as follows:

"You are further instructed that self-defense, as recognized by law, is a defensive and never an offensive act, and therefore before a defendant can avail himself of the plea of self-defense in justification of a killing it must have reasonably appeared to him at the time of the homicidal act, if you find that the defendant killed the deceased, that the act or acts of the deceased, from which defendant seeks to justify the killing, were such as made it reasonably appear to him at the time that he was in danger of suffering death or great bodily injury at the hands of the deceased. It is the duty of a person so threatened with danger to his life or person to use at the time all reasonable means apparent to a reasonable person under the circumstances shown to avoid such danger before taking human life, except that he is not bound to retreat to avoid the necessity or apparent necessity of killing, if he is in a place where he has a right to be and has done no act on his part to bring about the necessity for killing."

This instruction was approved in Brantley v. State, supra, 15 Okla. Cr. 15, 175 P. 51, as instruction No. 12 therein, Turner v. State, 4 Okla. Cr. 164, 189, 111 P. 988, and substantially in Johnson v. State, 69 Okla. Cr. 51, 101 P. 2d 265. We are of the opinion the giving of this instruction was not error herein. By reason of the foregoing the defendant's fourth, fifth, sixth and seventh propositions are without substantial merit.

Finally the defendant complains that the trial court erred in overruling his motion for new trial which point is well taken in view of the reversible error hereinbefore set forth as to proposition 3, and the case is accordingly reversed and remanded for a new trial.

POWELL, P. J., and JONES, J., concur.